UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WINNIE McDANIEL,

       Plaintiff,                               Hon. Wendell A. Miles

v.                                             Case No. 5:05-CV-76

COMMISSIONER OF SOCIAL
SECURITY,

       Defendant.
_____/

**REPORT AND RECOMMENDATION**

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act. Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive.

The Commissioner determined that Plaintiff is not disabled as defined by the Act. Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social security appeals, the undersigned recommends that the Commissioner's decision be **affirmed**.

## **STANDARD OF REVIEW**

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 52 years of age at the time of the ALJ's decision. (Tr. 18). She successfully completed high school and worked previously as a cashier, assembler, and certified nursing assistant. (Tr. 18, 86-90, 355-58).

Plaintiff applied for benefits on January 20, 2003, alleging that she had been disabled since December 23, 2002, due to pericardial effusion. (Tr. 44-46, 57, 327-29). Plaintiff's application was denied, after which time she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 30-43, 330-41). On May 4, 2004, Plaintiff appeared before ALJ B. Lloyd Blair, with testimony being offered by Plaintiff and vocational expert, Paul Delmar. (Tr. 349-76). In a written decision dated July 30, 2004, the ALJ determined that Plaintiff was not disabled. (Tr. 17-26). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 6-9). Plaintiff subsequently initiated this pro se appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## MEDICAL HISTORY

X-rays of Plaintiff's lumbosacral spine, taken on October 17, 2000, were unremarkable. (Tr. 110). There was "no evidence of fracture or subluxation" and the "disc spaces [were] relatively well preserved." *Id.*

On November 6, 2000, Plaintiff participated in an MRI examination of her lumbar spine, the results of which revealed "mild to moderate" degenerative changes at L4-5 and "minimal" disc bulging at L3-4, L4-5 and L5-S1. (Tr. 215). The vertebral bodies were "normal in height [and] alignment" and there was no evidence of spinal cord abnormality. *Id.*

X-rays of Plaintiff's chest, taken on February 28, 2001, revealed the presence of "stable mild cardiomegaly." (Tr. 115). The examination further revealed that "the pulmonary vasculature is within normal limits" and "there are no acute infiltrates or effusions." *Id.*

A December 11, 2001 exercise stress test revealed that Plaintiff "demonstrates a below average level of fitness for [her] age," but the results were otherwise "clinically negative." (Tr. 192).

On December 22, 2002, Plaintiff was examined by Dr. Bo Wu. (Tr. 137-39). Plaintiff reported that she was experiencing "generalized weakness, facial swelling, ankle swelling, and muscle pain." (Tr. 137). The results of a physical examination were unremarkable and Plaintiff exhibited 5/5 strength throughout. (Tr. 138). Plaintiff participated in an echocardiogram examination the results of which revealed "a moderately large pericardial effusion with no evidence of cardiac compromise." (Tr. 141). A CT scan of Plaintiff's thorax also revealed the presence of pericardial effusion. (Tr. 144). X-rays of Plaintiff's chest revealed cardiomegaly due to pericardial effusion. (Tr. 145).

On December 26, 2002, Dr. Andrew Duda performed a thoracotomy to drain this fluid from Plaintiff's pericardium. (Tr. 160-61). A laboratory examination of this fluid revealed that Plaintiff was suffering from "mild" pericarditis, but there was no evidence of malignancy. (Tr. 149).

Dr. Duda reported that he was "not sure that the pericardial effusion is solely responsible for [Plaintiff's] symptoms. They may be related to her thyroid status."[1] (Tr. 141).

On February 20, 2003, Plaintiff was examined by Dr. Duda. (Tr. 164-65). Plaintiff reported that she was feeling tired and weak, but otherwise was doing "quite well." (Tr. 164). The doctor noted that Plaintiff's tiredness and weakness "may be related to her thyroid condition." Dr. Duda further reported that Plaintiff was "breathing fine and has no major complaints in that regard." The results of a physical examination were unremarkable. *Id.* X-rays of Plaintiff's chest revealed the presence of "stable, mild cardiomegaly" with no evidence of effusion or vascular congestion. (Tr. 166).

On March 28, 2003, Plaintiff participated in a consultive examination conducted by Steve Geiger, Ph.D. (Tr. 222-26). Plaintiff reported that she was "depressed all of the time" and needed "help from others because it hurts so bad and I am so down." (Tr. 222). Plaintiff appeared anxious and depressed, but the results of a mental status examination were otherwise unremarkable. (Tr. 224-25). Plaintiff was diagnosed with post traumatic stress disorder; major depression, recurrent, moderate; panic disorder; and bulimia. (Tr. 225). Her GAF score was reported as 52.[2] (Tr. 226).

On May 3, 2003, Plaintiff participated in an MRI examination of her lumbosacral spine, the results of which revealed degenerative changes at L4-5 and L5-S1 with central canal and neural foraminal changes at L4-5. (Tr. 267).

---

[1] In 1997, Plaintiff underwent a thyroidectomy to treat hyperthyroidism. (Tr. 138).

[2] The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 30 (4th ed. 1994) (hereinafter DSM-IV). A GAF score of 52 indicates "moderate symptoms or moderate difficulty in social, occupational, or school functioning." DSM-IV at 34.

On May 13, 2003, Dr. Ashok Kaul completed a Psychiatric Review Technique form regarding Plaintiff's mental limitations. (Tr. 240-53). Finding that Plaintiff suffered from a disturbance of mood and anxiety, the doctor concluded that Plaintiff satisfied the Part A criteria for Section 12.04 (Affective Disorders) and Section 12.06 (Anxiety-Related Disorders) of the Listing of Impairments. (Tr. 241-49). The doctor determined, however, that Plaintiff failed to satisfy any of the Part B criteria for these particular impairments. (Tr. 250). Specifically, the doctor concluded that Plaintiff suffered moderate restrictions in the activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and never experienced episodes of decompensation. *Id.*

Dr. Kaul also completed a Mental Residual Functional Capacity Assessment form regarding Plaintiff's limitations in 20 separate categories encompassing (1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adaptation. (Tr. 236-38). Plaintiff's abilities were characterized as "moderately limited" in five categories. With respect to the remaining 15 categories, however, the doctor reported that Plaintiff was "not significantly limited." *Id.* Dr. Kaul concluded that Plaintiff was capable of performing "simple unskilled work [with] appropriate breaks [and] adequate pacing." (Tr. 238).

On July 16, 2003, Plaintiff was examined by Dr. Ved Gossain. (Tr. 285-88). Plaintiff reported that she was experiencing hair loss, fatigue, and depression. (Tr. 285). The results of a physical examination were unremarkable. (Tr. 286-87). The doctor concluded that Plaintiff "has many symptoms suggestive of hypothyroidism." (Tr. 287). The doctor further noted that additional laboratory tests were necessary to determine whether Plaintiff needed an adjustment in her thyroid medication. *Id.* Plaintiff's thyroid medication was subsequently increased. (Tr. 318).

6

On July 17, 2003, Plaintiff was examined by Dr. Todd Hickox with the Thoracic Cardiovascular Institute. (Tr. 324-26). Plaintiff reported that she was experiencing fatigue and shortness of breath. (Tr. 324). The results of a physical examination were unremarkable. (Tr. 325-26). The doctor concluded that the cause of Plaintiff's symptoms was "unclear." (Tr. 326).

On July 24, 2003, Plaintiff participated in an echocardiogram examination, the results of which revealed: (1) normal left ventricular size, (2) mild left ventricular hypertrophy, (3) normal left ventricular function, (4) mild left atrial enlargement, (5) mild right atrial enlargement, (6) calcified mitral valve annulus, (7) mild aortic regurgitation, (8) mild mitral valve regurgitation, and (9) no pericardial effusion. (Tr. 322-23).

On August 18, 2003, Plaintiff was examined by Dr. Maurice Bernaiche. (Tr. 261-62, 270-72). Plaintiff reported that she was experiencing depression, as well as pain in her knee and lower back. *Id.* Plaintiff reported that she experiences difficulty "standing from a seated position or standing for extended periods of time." (Tr. 262). Plaintiff also reported that if she walks more than two blocks she begins to experience "burning" in her legs. Plaintiff later acknowledged, however, that she had walked "1-2 miles to get to the clinic" that day. *Id.*

Plaintiff exhibited "mildly limiting" range of cervical motion. (Tr. 272). An examination of her right shoulder "suggested" that she may be experiencing rotator cuff dysfunction, but Spurling's maneuver[3] was negative. (Tr. 271-72). Plaintiff exhibited normal strength in her

---

[3] A positive Spurling's test suggests the presence of a cervical nerve root disorder. Thomas W. Woodward, M.D., and Thomas M. Best, M.D., Ph.D., *The Painful Shoulder: Part I Clinical Evaluation*, American Family Physician, May 15, 2000, *available at*, http://www.aafp.org/afp/20000515/3079.html (last visited April 24, 2006).

7

extremities, straight leg raising was negative, and Fabere's sign[4] was negative. *Id.* The doctor also reported that Plaintiff "exhibits no tender points for fibromyalgia." (Tr. 271).

The doctor also completed a report regarding Plaintiff's residual functional capacity. (Tr. 254-60). The doctor reported that Plaintiff can sit and stand for 30 minutes each. (Tr. 257). Dr. Bernaiche reported that during an 8-hour day Plaintiff can sit for "about 2 hours" and stand/walk for "about 2 hours," but requires a sit/stand option. (Tr. 257-58). The doctor reported that Plaintiff can occasionally lift/carry 10 pounds. (Tr. 258). Dr. Bernaiche reported that Plaintiff was unable to use her right upper extremity to perform repetitive reaching, grasping, turning, or twisting. (Tr. 259). According to the doctor, Plaintiff will need to take approximately 8 unscheduled breaks throughout the workday and will likely be absent from work "about four times a month." (Tr. 258-59).

On April 9, 2004, Plaintiff participated in an echocardiogram examination, the results of which revealed: (1) left ventricular hypertrophy with normal chamber size and overall contractility, (2) mildly increased aortic root size, (3) left atrial enlargement, (4) no significant pericardial effusion, (5) mild aortic, mitral, and tricuspid insufficiency, and (6) no obvious evidence for diastolic dysfunction. (Tr. 317).

On April 20, 2004, Plaintiff was examined by Dr. Joel Cohn with the Thoracic Cardiovascular Institute. (Tr. 318-21). Plaintiff reported that she was experiencing fatigue. (Tr. 318). The results of a physical examination were unremarkable. (Tr. 319-20). Noting the absence of a cardiovascular cause to explain Plaintiff's symptoms, the doctor reported that he has "concerns

---

[4] Fabere's sign (also known as Patrick's test) is used to determine whether a patient suffers from arthritis of the hip joint. J.E. Schmidt, *Schmidt's Attorneys' Dictionary of Medicine* P-81 (Matthew Bender) (1996).

that [Plaintiff] has a systemic connective tissue illness, although her fatigue could be related to just profound hypothyroidism." (Tr. 320).

At the administrative hearing Plaintiff testified that she was unable to work due to constant back pain which rated 9 (on a scale of 1-10). (Tr. 358-61). Plaintiff acknowledged, however, that she had never participated in physical therapy to treat her back pain. (Tr. 360). Plaintiff testified that she was unable to lift anything heavier than a loaf of bread. (Tr. 363). She reported that she can stand for 10 minutes and walk only 2-3 blocks. *Id.* Plaintiff reported that she is unable to perform any activities around her house. (Tr. 363-64). She further reported that she has trouble dressing, "can kind of" feed herself, and is unable to raise her arms to comb her hair. (Tr. 363, 366).

## ANALYSIS OF THE ALJ'S DECISION

### A. Applicable Standards

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[5] If the Commissioner can make a

---

[5] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

9

dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1420(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining his residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

## B. The ALJ's Decision

The ALJ determined that Plaintiff suffers from the following severe impairments: (1) pericarditis and (2) an affective disorder. (Tr. 21). The ALJ concluded that these impairments, whether considered alone or in combination, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. *Id.* The ALJ determined that while Plaintiff was unable to perform her past relevant work, there existed a significant number of jobs which she could perform despite his limitations. (Tr. 22-26). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

### 1. The ALJ's Decision is Supported by Substantial Evidence

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.

As noted above, the Commissioner has established a five-step disability determination procedure. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the

burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform light work[6] subject to the following restrictions: (1) she can only perform simple, unskilled, low stress jobs with 1, 2, or 3 step instructions, (2) she can only perform jobs which do not require her to read, compute/calculate, problem solve, or reason, (3) she can only perform jobs requiring brief and superficial contact with the public, (4) she can only perform jobs which permit her to be absent once per month, and (5) she cannot perform jobs with production quotas. (Tr. 24).

With respect to Plaintiff's mental impairments the ALJ further concluded that Plaintiff experiences moderate restrictions in the activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties maintaining concentration, persistence or pace, and has never experienced episodes of deterioration or decompensation in work or work-like settings. *Id.* After reviewing the relevant medical evidence, the Court concludes that the ALJ's determination as to Plaintiff's RFC is supported by substantial evidence.

The ALJ determined that Plaintiff was unable to perform her past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that

---

[6] Light work involves lifting "no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567. Furthermore, work is considered "light" when it involves "a good deal of walking or standing," defined as "approximately 6 hours of an 8-hour workday." 20 C.F.R. § 404.1567; Titles II and XVI: Determining Capability to do Other Work - the Medical-Vocational Rules of Appendix 2, SSR 83-10, 1983 WL 31251 at *6 (S.S.A., 1983).

a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding. *See Richardson*, 735 F.2d at 964.

While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform specific jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert Paul Delmar.

The vocational expert testified that there existed approximately 73,000 jobs which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 372-73). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990) (a finding that 2,500 jobs existed which the claimant could perform constituted a significant number); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988) (the existence of 1,800 jobs which the claimant could perform satisfied the significance threshold).

a. The ALJ Properly Considered Plaintiff's Impairments

As noted above, the ALJ concluded that Plaintiff suffers from pericarditis and an affective disorder. Plaintiff asserts that the ALJ failed to recognize that she also suffers several other

impairments, including hypothyroidism, cardiomyopathy, panic disorder, post traumatic stress disorder, and degenerative disc disease.

At step two of the sequential disability analysis articulated above, the ALJ must determine whether the claimant suffers from a severe impairment. The Sixth Circuit has held that where the ALJ finds the presence of a severe impairment at step two and proceeds to continue through the remaining steps of the analysis, the alleged failure to identify as severe some other impairment does not constitute reversible error so long as the ALJ considered the entire medical record in rendering his decision. *See Maziarz v. Sec'y of Health and Human Services*, 837 F.2d 240, 244 (6th Cir. 1987); *Ortiz-Rosado v. Commissioner of Social Security*, 2001 WL 700835 at *1 (6th Cir., June 12, 2001).

Here, the ALJ determined that Plaintiff suffered from severe impairments at step two of the sequential analysis and continued with the remaining steps thereof, noting that he gave "careful consideration" to "the entire record," an assertion supported by his detailed discussion of Plaintiff's impairments. (Tr. 25). This sufficiently indicates that the ALJ properly considered the combined effect of Plaintiff's various impairments. *See Loy v. Sec'y of Health and Human Services*, 901 F.2d 1306, 1310 (6th Cir. 1990) (citing *Gooch v. Sec'y of Health and Human Services*, 833 F.2d 589, 591-92 (6th Cir. 1987)). Furthermore, the ALJ's RFC determination is supported by substantial evidence.

Thus, even if the Court were to find that the ALJ erred in failing to find that Plaintiff suffered from additional impairments, such does not call into question the substantiality of the evidence supporting the ALJ's decision. *See Heston v. Commissioner of Social Security*, 245 F.3d 528, 535-36 (6th Cir. 2001) (recognizing that remand to correct an error committed by the ALJ

unnecessary where such error was harmless); *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("no principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"); *Berryhill v. Shalala*, 1993 WL 361792 at *7 (6th Cir., Sep. 16, 1993) ("the court will remand the case to the agency for further consideration only if 'the court is in substantial doubt whether the administrative agency would have made the same ultimate finding with the erroneous finding removed from the picture...'").

### b. The ALJ Properly Assessed the Medical Evidence

Following an August 18, 2003 examination, Dr. Bernaiche completed a report regarding Plaintiff's residual functional capacity. (Tr. 254-60). The doctor reported that Plaintiff can sit and stand for 30 minutes each. (Tr. 257). Dr. Bernaiche reported that during an 8-hour day Plaintiff can sit for "about 2 hours" and stand/walk for "about 2 hours," but requires a sit/stand option. (Tr. 257-58). The doctor reported that Plaintiff can occasionally lift/carry 10 pounds. (Tr. 258). Dr. Bernaiche reported that Plaintiff was unable to use her right upper extremity to perform repetitive reaching, grasping, turning, or twisting. (Tr. 259). According to the doctor, Plaintiff will need to take approximately 8 unscheduled breaks throughout the workday and will likely be absent from work "about four times a month." (Tr. 258-59). Plaintiff asserts that the ALJ failed to accord sufficient weight to Dr. Bernaiche's opinion.

Because Dr. Bernaiche examined Plaintiff on only one occasion his opinion is entitled to no special deference. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994); *Atterberry v. Secretary of Health and Human Services*, 871 F.2d 567, 571-72 (6th Cir. 1989). To the extent that

the doctor opined that Plaintiff is impaired to an extent beyond that recognized by the ALJ his opinion is not supported by the objective medical evidence, including the findings of his own examination. As noted above, the results of the doctor's physical examination of Plaintiff were quite unremarkable. Furthermore, a review of Dr. Bernaiche's report reveals that at least some of his responses were based on Plaintiff's subjective allegations rather than objective medical evidence or opinion. (Tr. 256).

### c. The ALJ Properly Evaluated Plaintiff's Subjective Complaints

The ALJ concluded that Plaintiff's subjective allegations of pain and limitation were "somewhat overstated and inconsistent with the available evidence." (Tr. 22). Plaintiff asserts that the ALJ improperly discounted her subjective allegations.

As the Sixth Circuit has long recognized, "pain alone, if the result of a medical impairment, *may* be severe enough to constitute disability." *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984) (emphasis added). As the relevant Social Security regulations make clear, however, a claimant's "statements about [his] pain or other symptoms will not alone establish that [he is] disabled." 20 C.F.R. § 404.1529(a); *see also*, *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997) (quoting 20 C.F.R. § 404.1529(a)). Instead, as the Sixth Circuit has established, a claimant's assertions of disabling pain and limitation are evaluated pursuant to the following standard:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively

> established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531 (citations omitted). This standard is often referred to as the *Duncan* standard. *See Workman v. Commissioner of Social Security*, 2004 WL 1745782 at *6 (6th Cir., July 29, 2004).

Accordingly, as the Sixth Circuit has repeatedly held, "subjective complaints may support a finding of disability only where objective medical evidence confirms the severity of the alleged symptoms." *Id.* (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)). However, where the objective medical evidence fails to confirm the severity of a claimant's subjective allegations, the ALJ "has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record." *Workman*, 2004 WL 1745782 at *6 (citing *Walters*, 127 F.3d at 531).

In this respect, it is recognized that the ALJ's credibility assessment "must be accorded great weight and deference." *Workman*, 2004 WL 1745782 at *6 (citing *Walters*, 127 F.3d at 531); *see also*, *Heston v. Commissioner of Social Security*, 245 F.3d 528, 536 (6th Cir. 2001) ("[i]t is for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony"). It is not for this Court to reevaluate such evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must stand. The ALJ found Plaintiff's subjective allegations to not be fully credible, a finding that should not be lightly disregarded. *See Varley v. Sec'y of Health and Human Services*, 820 F.2d 777, 780 (6th Cir. 1987).

It is not disputed that Plaintiff suffers from severe impairments. However, as the ALJ properly concluded, Plaintiff's subjective allegations of disabling pain and limitation are not supported by objective medical evidence. None of Plaintiff's treating physicians have indicated that she is impaired to an extent beyond that recognized by the ALJ.

As Defendant correctly notes, Plaintiff has provided contradictory responses when asked about her daily activities. In January 2003, Plaintiff reported that she was able to perform a variety of activities, including cooking shopping, light housework, sewing, and dancing. (Tr. 68-71). Plaintiff also reported that she reads, attends church, watches movies, and visits with friends and family. *Id.* However, only two months later Plaintiff reported that she "can't do any walking" and was unable to even walk to the bathroom without stopping to rest. (Tr. 83-85). Plaintiff reported that she was unable to shop or perform any household activities and, furthermore, needed assistance caring for her personal needs. *Id.* Furthermore, as noted above, when Plaintiff was examined by Dr. Bernaiche she reported that she was unable to walk farther than two blocks, despite having walked in excess of one mile to attend the examination. (Tr. 262).

Furthermore, as Plaintiff acknowledged despite suffering from allegedly disabling back pain she has never participated in physical therapy or other aggressive treatment. The Court further notes that the medical records reveal that Plaintiff has a demonstrated history of cancelling or simply not attending scheduled medical appointments. Specifically, the record reveals that Plaintiff simply failed to appear for at least 15 appointments and cancelled 14 others. (Tr. 177, 184-85, 187, 190-91, 206, 213-14, 265, 296-97, 306). Such behavior is inconsistent with Plaintiff's subjective allegations of disabling pain and limitation. In sum, there exists substantial evidence to support the ALJ's credibility determination.

17

## **CONCLUSION**

For the reasons articulated herein, the undersigned concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence. Accordingly, it is recommended that the Commissioner's decision be **affirmed**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Date: June 5, 2006                                         /s/ Ellen S. Carmody
                                                                  ELLEN S. CARMODY
                                                                  United States Magistrate Judge